# EXHIBIT 1
*(Samango Jr. Dep Excerpts)*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Civil Action No. CA-11-CV-00819 (JHS)

---

ANTHONY J. SAMANGO, JR.,

    Plaintiffs,

-vs-

UNITED STATES OF AMERICA,

    Defendant.

ORAL DEPOSITION OF:

    ANTHONY J. SAMANGO, JR.

---

\* \* \* \*

WEDNESDAY, DECEMBER 14, 2011

\* \* \* \*

MASTROIANNI & FORMAROLI, INC.

Certified Court Reporting & Videoconferencing

251 South White Horse Pike

Audubon, New Jersey 08106

856-546-1100

Anthony J. Samango, Jr.                December 14, 2011

Page 47

```
 1   agreement with CIP Frames?
 2        A.      I don't think I have any obligation.
 3        Q.      Did you?
 4        A.      I don't remember.
 5        Q.      So then what happened after that
 6   initial conversation with David Johnson?
 7        A.      Well, you know, subsequent followup
 8   conversations we talked about responsibilities, risk,
 9   what his percentage of profit might be, and we struck
10   a deal.
11        Q.      Was this a written agreement?
12        A.      No.  It was a week-to-week agreement.
13        Q.      What do you mean week-to-week?
14        A.      Well, in the absence of an agreement,
15   he could be terminated at the end of the week.
16        Q.      So the employees -- what was your
17   agreement if it was terminated after one week, what
18   would happen to the employees?
19        A.      Well, they weren't his concern.  He was
20   only in it for the profit.  Those employees are my
21   employees.
22        Q.      And how much did you promise to pay
23   this David Johnson?
24        A.      I did pay him ten percent.
25        Q.      Ten percent?
```

```
 1        A.      No.
 2        Q.      How did you come up with this ten
 3   percent figure of payment to David Johnson?
 4        A.      I offered five, he wanted 20, we
 5   settled on ten.  At 20 there was nothing in it for
 6   me.  I wasn't saving anything.
 7        Q.      Were you involved with the
 8   incorporation of CIP Frames?
 9        A.      No.
10        Q.      Do you know who was?
11        A.      No.
12        Q.      Did you have any discussions with
13   anyone regarding the incorporation of CIP Frames?
14        A.      I did not.
15        Q.      Did you assist David Johnson in setting
16   up CIP Frames?
17        A.      No.  I mean, I suggested what he should
18   do, but I didn't assist.
19        Q.      What did you suggest he should do?
20        A.      Hire a lawyer and incorporate.
21        Q.      Do you know whether he did that?
22        A.      Did he incorporate?
23        Q.      No, whether he hired a lawyer?
24        A.      Oh, I don't know.
25        Q.      So you had absolutely no involvement in
```

```
 1    the incorporation of CIP Frames?
 2            A.      I didn't want any involvement and I
 3    didn't have any.
 4            Q.      Do you know whether your son had any
 5    involvement with the incorporation of CIP Frames?
 6            A.      You're going to have that opportunity
 7    to ask him that.
 8            Q.      But I'm asking you.
 9            A.      I don't know.
10            Q.      Were you or your son ever an officer of
11    CIP Frames?
12            A.      No.
13            Q.      Did you ever sign any documents, you or
14    your son, as an officer of CIP Frames?
15            A.      I did not.  I had seen one document
16    that purports that I was an officer during these
17    proceedings, but that wasn't on that document when I
18    signed it.
19            Q.      Do you know who were the officers of
20    CIP Frames?
21            A.      I do not.
22            Q.      Do you know an entity by the name of
23    CarCo?
24            A.      Yeah.
25            Q.      How are you familiar with?
```

```
 1   it.
 2        Q.     How did you inform the unions?
 3        A.     Telephone call.
 4        Q.     These were -- you mentioned six unions?
 5        A.     Five or six.  I mean, I don't know if
 6   he employed Teamsters.  Carson Concrete does, but the
 7   other five were all on that project.
 8        Q.     Did CIP Frames have a collective
 9   bargaining agreement with the unions?
10        A.     Yeah, they had to enter into one for
11   this project.
12        Q.     With each of the unions?
13        A.     I think so.
14        Q.     Did you enter into those -- did you
15   sign those collective bargaining agreements?
16        A.     I don't think so.
17        Q.     So these are different collective
18   bargaining agreements than the ones that Carson
19   Concrete signs with the five or six unions?
20        A.     Well, the same agreement, but they
21   would have just different company name on there.
22        Q.     So just to clarify, Carson Concrete
23   would have to sign one agreement and CIP Frames would
24   have to sign another agreement?
25               MR. MARTIN:  Objection to form.  You
```

Anthony J. Samango, Jr.                December 14, 2011

Page 100

```
 1        A.      I don't recall having any.
 2        Q.      Other than the checkbooks -- you
 3   mentioned -- do you know where the checkbooks were
 4   kept for these Commerce Bank accounts?
 5        A.      I testified earlier that I don't know
 6   where Carson Concrete checks are kept, so it's not
 7   likely I knew where these were kept.
 8        Q.      You just knew you had signatory
 9   authority on them?
10        A.      I did know that, yes.
11        Q.      Why did your son also have signatory
12   authority on these accounts?
13        A.      Simply to sign them in my absence.  I
14   testified previously that I sign all the checks.
15        Q.      Is it fair to say that the only time
16   your son signs them is if you are not present?
17        A.      That's correct.
18        Q.      Do you remember how many bank accounts
19   were opened on behalf of CIP Frames in which you were
20   a signatory?
21        A.      Only as a result of this proceeding, I
22   saw two.
23        Q.      So you're only aware of two?
24        A.      Correct.
25        Q.      Have you ever asked CIP Frames about
```

1      Q.      And as you testified in Exhibit 1, it
2  reflects the ten percent that David Johnson was
3  compensated for providing the employees to the job
4  site at Waterfront Square?
5      A.      Well, I mean, it's questionable what he
6  was compensated for, but okay.
7      Q.      What was he compensated for?
8      A.      To get me lower insurance.
9      Q.      And as is reflected on the invoice,
10 with these funds CIP Frames was supposed to pay the
11 union benefits, Social Security, Medicare, FUTA,
12 SUTA, workers' comp, general liability insurance and
13 other insurance?
14     A.      Well, I had to pay the gross amount of
15 the invoice.
16     Q.      Carson?
17     A.      Carson paid the gross amount of the
18 invoice.  CIP Frames paid the workers and money was
19 reserved to pay the unions and the rest of the money
20 went to Johnson's CIP accounts, which I have no
21 knowledge of.
22     Q.      And if Johnson wasn't a signatory, how
23 was he supposed to withdraw from the account?
24     A.      Well, I assume he had his own CIP
25 Frames accounts.

1    Q.    But how would he withdraw from the CIP
2  accounts that we've reviewed if he wasn't a
3  signatory?
4    A.    Well, it's my understanding that he got
5  checks from Carson Concrete.  Made also payable to
6  CIP Frames.
7    Q.    Is it your testimony that Carson
8  Concrete paid David Johnson?
9    A.    Paid CIP Frames on the residue or the
10 balance of these invoices.
11   Q.    Did Carson Concrete pay CIP Frames --
12 did Carson -- so is it your testimony that the funds
13 to cover the ten percent of David Johnson's
14 compensation was not deposited into the three
15 accounts that we've looked at today?
16   A.    That is part of my testimony.  What I'm
17 testifying to is that the funds -- you have this
18 invoice that covers -- let me start over.
19   Q.    Sure.
20   A.    The money that went into the CIP Frames
21 accounts that my son and I were signatory to would
22 have covered employees' wages, union benefits and
23 various insurances.  The balance of the money and the
24 ten percent was payable to CIP Frames, but did not go
25 into those accounts, it went to his accounts or what

```
 1   he did with it, I don't know what he did with it.
 2        Q.     And how would --
 3        A.     Carson check to CIP Frames.
 4        Q.     And how would those funds get delivered
 5   to CIP Frames?
 6        A.     I don't know whether they were mailed
 7   or -- I don't know how they were delivered.
 8        Q.     And who were they mailed to?  What
 9   address were they mailed?
10        A.     I said I don't know how they were
11   delivered.
12        Q.     Do you remember David Johnson coming to
13   Carson Concrete to pick up the checks?
14        A.     I testified earlier that I met with him
15   a couple of times at the office, so I don't know when
16   else he came there besides the couple of times that I
17   met with him.  Could have, but I don't know.
18        Q.     And who would prepare the check for you
19   to sign on behalf of Carson Concrete?
20        A.     I signed all the Carson checks.
21        Q.     But You testified that you don't
22   prepare checks?
23        A.     No, I don't prepare them.  They would
24   be prepared along with any other check that Artz
25   prepares.
```

```
 1     Q.     Then would you sign the check or would
 2  you and your son sign?
 3     A.     You know, I probably signed all those
 4  because they weren't as time sensitive.  Not to say
 5  that if I was absent he didn't sign them, but he
 6  really only signed checks in my absence.
 7     Q.     How often would you -- for these
 8  invoices received from Carson Concrete, examples of
 9  which are marked as Exhibit 1, how often would you
10  pay CIP Frames that ten percent?
11     A.     Well, I testified earlier that we got
12  paid from our client monthly or 60 days, whichever.
13  So it would coincide with that.
14     Q.     So you would pay these ten percent on a
15  monthly basis?
16     A.     Yeah.
17     Q.     Mr. Samango, at some point you were
18  contacted by the IRS about the unpaid payroll taxes
19  of CIP Frames?
20     A.     I think -- you asked me when?
21     Q.     I'm asking you were you contacted?
22     A.     I was, yes.
23     Q.     And when were you contacted?
24     A.     I was contacted late spring, May or
25  June of 2009.
```

```
 1        Q.      Mr. Johnson -- Mr. Samango.
 2        A.      About the same size.  He's got a better
 3   tan.
 4        Q.      Sorry.
 5                You previously mentioned that you spoke
 6   to Mr. Johnson a few times on the phone, correct?
 7        A.      Yeah.
 8        Q.      And what phone number, do you know what
 9   phone number you used to call him?
10        A.      I don't think I would have called him,
11   I think he called me.  I don't know.  I don't
12   remember reaching out for him.  I did have a phone
13   number, I don't know where it's gotten to.
14        Q.      Well, where would you have documented
15   what his phone number was?
16        A.      Did I give you his phone number?
17                MR. MARTIN:  I don't recall.
18                THE WITNESS:  I don't know.  At one
19   time I had his phone number.
20   BY MS. SAIZ:
21        Q.      How recently was it that you had his
22   phone number?
23        A.      Years.
24        Q.      Years?
25        A.      Um-hum.  Two, maybe three years.
```